## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| B.L., individually and on behalf of J.L., his minor child at all pertinent times, and on behalf of all similarly situated students,<br><br>                                Plaintiffs,<br><br>v.<br><br>MICHAEL J. FETHERMAN, Individually and in his capacity as Superintendent, BETH AZAR, Individually and in her capacity as former Acting Superintendent, DR. SUMIT BANGIA, Individually and in her capacity as Assistant Superintendent, FRANK SANCHEZ, Individually and as former Principal of Mountain Lakes High School, ANGELA TSAI, Individually and as an employee and/or independent contractor of or for the Mountain Lakes School District, ALEX FERREIRA, Individually and in his capacity as Business Administrator and Board Secretary, JOANNA-- CALABRIA BARKAUSKAS, Individually and in her capacity as President, JENNIFER PARKER, Individually and in her capacity as Vice President, DR. ARUNI DON, Individually and in her capacity as a member, DR. KEVIN ERNEST DRISCOLL, Individually and in his capacity as a member, DR. JAMES HIRSCHFELD, Individually and in his capacity as a member, MEGHAN LEININGER, Individually and in her capacity as a member, TRICIA LEWIS, Individually and in her capacity as a member, DR. LAUREN SILVA MCINTYRE, Individually and in her capacity as a member, ERINN TUCKER, Individually and in her capacity as a member, JONATHAN LEVAR, Individually and in his capacity as a member, MOUNTAIN LAKES SCHOOL DISTRICT, JOHN DOES 1-25, and ABC DEFENDANTS 1-25, said names being fictitious, who are similarly situated and like-minded actors and entities as the above named defendants,<br><br>                                Defendants. | **CIVIL ACTION**<br><br>Civ. No.<br><br>**VERIFIED COMPLAINT AND JURY DEMAND** |

The plaintiff, B.L., individually, on behalf of J.L., his minor child at the relevant times, and on behalf of all similarly situated students, by and through his attorneys, Murray-Nolan Berutti LLC, with knowledge as to his own acts, and upon information and belief as to all others, complains of the defendants as follows:

## OVERVIEW

1.       The Mountain Lakes School District ("MLSD") has, since on or about June 6, 2020, engaged in a campaign of open racial discrimination in some of its educational programming, wherein it has forced a racial political ideology onto its students which has violated its obligations under Title VI of the United States Code, and otherwise has created a hostile educational environment for its students, including J.L., who was damaged in his constitutional and statutory rights not to be discriminated against based on his race or the color of his skin.

2.       The programming includes, without limitation, shibboleths such as "[w]hite children are receiving coded and sometimes direct messages all the time about their racial superiority," "[e]xplicit conversations that name race are needed if we want to interrupt racial biases white children are already forming," and that MLSD needs to "teach about white peoples roles in perpetuating racism."

3.       Defendants' policy objectives were designed to promote discriminatory judgments of individuals, including the discrimination of diminished expectations, based on the color of peoples' skin, and not the content of their characters or the individual diligence of their studies and efforts at self-improvement.

4.       The *Cambridge Dictionary* defines "indoctrinate" as "to often repeat an idea or belief to someone until they accept it without criticism or question." The outrageous and shocking politically-motivated racial fulminations by defendants, or some of them, amount to indoctrination,

and were brought to the attention of some or all of the individually named defendants ("individual defendants") by B.L. and at least one other parent--a self-described minority--all or most of whom ignored and rejected such protestations.

5.  Meanwhile, MLSD and the individual defendants, or some of them, gave 'white glove and red-carpet treatment' to a group of individuals who identified themselves as the "MLBT Equity Student/Alumni Committee," ("MLBT" standing for Mountain Lakes Boonton Township) which pushed for greater political activism and ideologically race-based educational curricula.

6.  MLSD and the individual defendants have failed to take any remedial action with respect to its racist educational programming, but rather, have given every indication that they intend to force feed the ill-named "anti-racist" educational agenda on J.L. and all other students within MLSD, thus causing them to be similarly situated with J.L., despite receiving federal funding for its educational programming, and for funding of teachers and administrators under contract with MLSD.

7.  Pursuant to 42 U.S.C. § 2000d of the United States Code ("Title VI"), since it receives federal funding, MLSD may not impose such racially charged programming on its students, and must be enjoined from further such activity if it is to continue receiving federal funding.

8.  Similarly, pursuant to 42 U.S.C. § 1981, defendants have created an actionable hostile educational environment for J.L. and others which would not exist but for their racially discriminatory policies, for which an award of compensatory damages, punitive damages, and counsel fees and costs is appropriate.

9.  Finally, defendants' actions, including their ongoing refusal to remedy their openly race-based disparate treatment, and their discrimination against B.L. due to his questioning the

legality and propriety of their actions, was openly discriminatory and did not support any legitimate state interest, such that they violated the 42 U.S.C. § 1983, the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.,* and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 *et seq.*, for which injunctive relief, damages, punitive damages, and fee shifting is appropriate.

10.     Defendants' insistence on proceeding with such programming, and their refusal to ensure that such educational malpractice would not occur again in the future, is unfortunate, because it has left B.L. with no choice other than to accept such illegal and discriminatory conduct within the school district against his child and others, or else to bring a lawsuit. Defendants have made the choice of this lawsuit.

## JURISDICTION AND VENUE

11.     This action is brought pursuant to Title VI, 42 U.S.C. §1982, and 42 USC § 1983, such that jurisdiction exists pursuant to 28 USC Section 1331.

12.     Supplemental jurisdiction exists pursuant to 28 USC § 1367.

13.     Venue of this matter is proper pursuant to 28 USC § 1391(b)(1), as the Plaintiffs reside in this District.

## THE PARTIES

14.     B.L. is a resident of Mountain Lakes, New Jersey, and is the father of J.L., who is bringing claims on his own behalf, on behalf of J.L., and on behalf of all similarly situated students of the Mountain Lakes School District.

15.     J.L. is a Caucasian, so-called "white" student who attends Mountain Lakes High School, which is a place of public accommodation, and was a minor during all or most of the relevant events which are set forth herein, who has been harmed by the acts and/or omissions of defendants.

16.     All students within the MLSD school district are, in whole or in part similarly situated, since they are the intended beneficiaries of federal funding of MLSD and have been damaged in their federal and state constitutional and/or statutory rights not to be discriminated against based on race and/or color.

17.     MICHAEL J. FETHERMAN is an individual and the current Superintendent of Mountain Lakes Public Schools.

18.     BETH AZAR is an individual and was Acting Superintendent of Mountain Lakes Public Schools.

19.     DR. SUMIT BANGIA is an individual and the Assistant Superintendent of Mountain Lakes School District.

20.     FRANK SANCHEZ is an individual and was Principal of Mountain Lakes High School.

21.     ANGELA TSAI is an individual and an employee and/or independent contractor of or/for the Mountain Lakes School District.

22.     ALEX FERREIRA is an individual and the Business Administrator and Board Secretary of Mountain Lakes School District.

23.     JOANNA CALABRIA BARKAUSKAS, is an individual and the President of the Mountain Lakes Board of Education, and held such position at all relevant times herein.

24.     JENNIFER PARKER is an individual and the Vice President of the Mountain Lakes Board of Education, and held such position from 2021 to 2023, and her term will not expire before the end of the 2023 school year.

25. DR. ARUNI DON is an individual a member of the Mountain Lakes Board of Education, and held such position from 2022 through 2024, and her term will not expire before the end of the 2024 school year.

26. DR. KEVIN ERNEST DRISCOLL is an individual and is a member of the Mountain Lakes Board of Education, and held such position from 2021 to 2023, and his term will not expire before the end of the 2023 school year.

27. DR. JAMES HIRSCHFELD is an individual and is a member of the Mountain Lakes Board of Education and held such position at all relevant times herein.

28. MEGHAN LEININGER is an individual and is a member of the Mountain Lakes Board of Education, and held such position from 2022 through 2024, and her term will not expire before the end of the 2024 school year.

29. TRICIA LEWIS is an individual and is a member of the Mountain Lakes Board of Education, and held such position from 2021 through 2023, and her term will not expire before the end of the 2023 school year.

30. DR. LAUREN SILVA MCINTYRE is an individual and is a member of the Mountain Lakes Board of Education, and held such position in 2022, and her term will not expire before the end of the 2022 school year.

31. ERINN TUCKER is an individual and is a member of the Mountain Lakes Board of Education, and held such position from 2022 through 2024, and her term will not expire before the end of the 2024 school year.

32. JONATHAN LEVAR is an individual and is a member of the Mountain Lakes Board of Education.

33.     MOUNTAIN LAKES BOARD OF EDUCATION is a municipal government entity, funded by the taxpayers of the Borough of Mountain Lakes, and otherwise is funded by the United States Department of Education and/or other federal agencies, with offices located at 96 Powerville Road, Mountain Lakes, New Jersey 07046.

34.     JOHN DOES 1-25, said names being fictitious, are similarly situated and likeminded actors as the above-named individual defendants and/or in their official capacities.

35.     ABC DEFENDANTS 1-25, said names being fictitious, are entities which are similarly situated and likeminded actors as the above-named entity defendants.

36.     At all relevant times, the defendants were state actors who were acting under color of law.

## FACTS COMMON TO ALL COUNTS

37.     On or about June 6, 2020, in the wake of the George Floyd murder in Minnesota, defendant Sanchez forwarded a communication via email to parents of Mountain Lakes High School children which included an e-pamphlet entitled "Seeking Justice from Reflection to Action", which Sanchez had authored on that day and under the auspices of MLSD with whom he was under contract. Sanchez forwarded the same with the consent, express or implied, of MLSD, then-Acting Superintendent defendant Azar, Assistant Superintendent defendant Bangia, and the then-existing Board of Education.

38.     At such time, and at all relevant times thereafter including at present, MLSD was receiving federal funding for its educational programs and for payment of teachers and administrators who were under contract with MLSD.

39.     The Sanchez pamphlet encouraged political activism in support of "anti-racist" ideology and expressed a commitment to "working with our teachers to make sure our curriculum continues to reflect this initiative."

40.     The pamphlet, without any actual factual basis borne out by prior conduct within the Mountain Lakes School system, suggested that there existed "Institutionalized Racism", thus potentially exposing MLSD to lawsuit by such false admission and potentially damaging taxpaying citizens who are legally compelled to support MLSD.

41.     Sanchez specifically emphasized that the pamphlet was a "curriculum post" which he would update "to add articles on how to talk with teenagers about the lack of equity in America that may in turn help fuel your family's discussions."

42.     Sanchez further asserted within the pamphlet that "this is a beginning of a conversation" and that he "just wanted to send you a note to let you know how we feel and what we stand for." He continued, "And most importantly, if you feel we are straying from this, let us know. Keep us honest."

43.     Such pamphlet was overtly political in nature, and contained assumptions not borne out by facts specific to MLSD. Its overt political and racial narrative was hostile to those who disagreed with the same, or who otherwise had not developed a complete sense of the facts from which rational judgments could be made, such that they were being deprived of education, and exposed to indoctrination.

44.     On the same day, Sanchez sent a video to all students which was a "call to arms" promoting concepts such as "white privilege", which is overtly racial messaging which treats individuals differently in terms of the 'official' perception of them based on their race and color

and, thus, was hostile in nature, and caused damage to students in their state and federal constitutional rights not to be discriminated against based on race and/or color.

45.    The video also was sent as a message of support for political messaging, including the existence of "systemic injustice in this country", and "institutional inequity", and called for students "to act", while also compelling students to attend rallies for the Black Lives Matter political movement thus adding to the hostile nature of the video with respect to individuals with so-called white skin.

46.    B.L., whose child, J.L. attended the high school and was subjected, together with all similarly situated students, to the racialized political messaging which Sanchez treated as curriculum, although it had not been approved through the legal channels for curriculum development, politely reached out to Sanchez to advise as to his belief that such communications violated MLSD policies related to racial bias, that it was inappropriate, and also that it violated state and federal laws, thus causing damage to J.L. and others.

47.    Thereafter, on his official Twitter account, "MLHS Principal", and through a community wide bulletin known as "virtual backpack", Sanchez promoted an event which was co-sponsored by MLSD and the Mountain Lakes Education Foundation, which was to occur on June 16, 2020, which event openly divided people by race and implied that due to their race, people are born with a pre-determined path of privilege or lack thereof.

48.    Sanchez essentially rebuffed or ignored B.L.'s commentary. Thus, on June 13, 2020, B.L. sent an email to the individual defendants, or some of them, as officials of MLSD, and detailed why the subject "curriculum" as was described by Sanchez, or messaging under the auspices of MLSD, violated policy and law, and caused damage by creating confusion and difficulties to students with respect to such illegal and improper messaging.

49.     B.L. specifically directed the individual defendants, or some of them, to Section 2224 of the MLDS Policy Manual which noted that state and federal statutes and regulations prohibit school districts from discriminatory practices by reason of race, and directing the Superintendent, in this case defendant Azar who was copied on the communication by B.L., to prevent all bias and discrimination in all district policies, practices, and facilities, such that the concept of "white privilege", whether or not it was one of merit, was illegally being promoted to J.L. and all similarly situated students as targeting a "privileged" class of people identified by race.

50.     B.L. also specifically directed the individual defendants, or some of them, to Section 6121 of the MLSD Policy Manual, which confirms that no student shall be subjected to discrimination in any educational program or activity on the basis of race or color, and which compels the Superintendent, in this case defendant Azar, to eliminate discrimination and promote understanding and mutual respect among students regardless of race or color, among other things. Section 6121 also provides that materials which are biased or stereotyped shall not be used within the district.

51.     In such email to the individual defendants, or some of them, B.L. pointed out additional points which demonstrated the hostile educational environment created by Sanchez's communications, and the potential risks and legal liabilities to which he was exposing the district, as well as related dangers he may be creating to the safety and well-being of students who were, depending on how the material was interpreted by them, being compelled to act by Sanchez.

52.     After receiving no response, B.L. followed up on June 16, 2020, and specifically reiterated the impropriety of MLSD's endorsement of a webinar of that evening which was to be focused on "white privilege", which webinar had not been discussed at the prior evening's Board

meeting. B.L. reiterated that such webinar violated MLSD policies, including Sections 2224 and 6121, and otherwise was illegal under state and federal law, thus damaging students, including J.L.

53.     Instead of taking action to assess B.L.'s concerns, on June 17, 2020, the "Mountain Lakes Educational Foundation" in partnership with MLSD held a two plus hour webinar on the topic, "How to Have Meaningful Conversations with Your Child on Anti-Racism, Systemic Injustice, and White Privilege", in which Sanchez and other MLSD administrators and staff members appeared on behalf of MLSD, with whom they were under contract, which contracts were funded, in whole or in part, by federal funds. The featured speaker of the webinar was the author of a book titled "Raising Anti-Racist Kids: An Age by Age Guide for Parents of White Children". Among the stated purposes of the webinar was "how you can be the most supportive you can be" of the "protests and the Black Lives Matter movement."

54.     Soon thereafter, the webinar was delivered by MLSD to the entire school community, in further promotion of a hostile educational environment and in violation of state and federal laws, including Title VI.

55.     Defendant Azar finally responded to B.L.'s emails on June 18, 2020, and merely asserted that although the webinar's title may have suggested otherwise, its content was appropriate for children, and she felt that it did not in any way compromise MLSD's policies.

56.     In a follow up thereto on June 18, 2020, B.L. asked defendant Azar whether she would have a conversation with him and his attorney.

57.     As would become just another instance in a continuing pattern among MLDS administrators, defendant Azar ignored B.L. Thus, on July 3, 2020, B.L. attempted to prompt her with an inquiry as to her response to the question as to meeting with he and his lawyer, which B.L asserted he was eager to learn.

58.     Meanwhile, beginning June 23, 2020, a group purportedly comprised of current and former MLSD (which includes Mountain Lakes and Boonton Township) students who supported so-called "racial equity" began an email dialogue with MLSD administrators in which massive changes to curriculum, school holidays, and related issues in support of "anti-racism", including "racial injustice", "systemic inequality", and "white privilege", would be discussed at length. The group called itself "MLBT". Indeed, between June 23, 2020 and July 3, 2020, there were numerous interactions between several of the individual defendants, including Azar, and the MLBT group, at the same time that B.L. was being ignored. In one such email to the MLSD group, defendant Azar volunteered to include Sanchez, who also was the former Director of Curriculum and person in charge of Professional Development in MLSD, in the communications since MLBT had not copied him.

59.     Such profound openness to the MLBT group and its objectives continued for many months and included scores of emails between MLBT and top administrators, and meetings, including with several of the individual defendants.

60.     During such time period, B.L. and another gentleman ("Objector 2"), a self-described minority, who questioned the "anti-racism" curriculum of MLSD and the individual defendants, or some of them, sought to engage in dialogue with administrators about their respective objections and the associated legal problems therewith. B.L. and Objector 2 were purposely ignored by defendants. Indeed, documents are known to exist, but have not been provided, where the objections of B.L. and Objector 2 were discussed among some of the individual defendants, wherein it is believed that it was decided that they would be ignored as a matter of policy, which policy had no legitimate governmental purpose, was based on the desire to engage in invidious race-based discrimination, and was irrational.

61.     On August 11, 2020, MLSD sponsored a workshop with an individual named David Schwartz, called "Creative Options for Progressive Educators," which, upon information and belief, perpetuated the negative stereotypes about so-called white people, and stressed the issue of "white privilege", including the political shibboleth that white racism commences at or near birth.

62.     MLSD entered into a contract with and paid Schwartz, in whole or in part, with funds from federal, state, and local governments.

63.     When the new school year began, B.L. again reached out to some of the individual defendants, giving them time to get the new school year up and running. Defendant Fetherman had become Superintendent. Fetherman and B.L. met on several occasions, and Fetherman assured B.L. that he would not be used as a political tool from any perspective.

64.     Several weeks after one such meeting with B.L., however, MLSD began to promote a second webinar about the "Matters Movement". Thus, B.L. forwarded an email to Fetherman asserting his disappointment with Fetherman after their conversations, since despite his promises, the district was continuing to engage in racially discriminatory and politically motivated content by partnering with outside parties. Fetherman rejected B.L.'s assertion that MLSD's focus on purported white racism based on skin color somehow was inappropriate, asserting that "surely you can't be putting this in the same bucket…it's not more important than ever that communities come together."

65.     In response, B.L. sent a series of questions to Fetherman asking how such issues were part of his mandate as Superintendent, how it was appropriate to be so acting under District policies, and how it was determined exactly which social campaigns were worthy of the school's endorsement and resources, as opposed to others.  Fetherman failed ever to respond.

66.     On November 16, 2020, a webinar was announced in the district for the next night, titled, "Does the 'Matters' Movements Matter in Mountain Lakes?" which was an open politically oriented program sponsored by MLDS, which again expounded on racist theories related to "whiteness" and "white privilege".

67.     The webinar was also promoted by defendant Tsai, who is either employed by MLSD or is an independent contractor who has the title "theatre director", and who otherwise co-founded the ML/BT Social Justice Media Club. Defendant Tsai used her Mountain Lakes Schools email account to promote the webinar with the express or implied permission of MLSD and/or the individual defendants, or some of them. On November 17, 2020, B.L. inquired of defendant Fetherman and other individual defendants as to whether MLDS sponsored or hosted the webinar and was met with a denial. Instead, defendant B.L. was falsely advised by the MLSD attorney, Steven Fogarty, Esq. ("Fogarty") that the webinar was sponsored by the Mountain Lakes Police Department, and that MLDS was invited to participate.

68.     B.L. thereafter inquired of the Mountain Lakes Police Chief, who denied that the police department sponsored the event, but rather, that it was sponsored by the MLBT group and schools which had been frequently interacting with the individual defendants, or some of them, which then convinced MLDS to take on the role of host.

69.     B.L. thereafter on November 17, 2020, revealed to Fetherman and others, including Fogarty, who had falsely denied that MLSD was responsible for the webinar, laid out the facts, and again expressed how MLSD was violating law including, but not limited to, MLDS Policy Sections 2224, 6121, 6161.2, 2131.1, 6161.1, and 6144, N.J.A.C. 6A:7, and Title VI of the Civil Rights Act.

70.      After the police confirmed that the webinar was an MLSD event, Fogarty reached out to B.L. and requested a meeting. Such a meeting occurred thereafter by video between B.L., his attorney, Fogarty, Fetherman, and defendant Barkauskas, who asked what B.L. desired as an outcome.

71.      In a written response, B.L. through his attorney, provided the following proposed solutions which would help in correcting the illegal actions that had occurred: (a) a mutually agreed upon explanatory letter from Fetherman to the community; (b) annual policy and legal responsibilities training for all administration, faculty, and staff so that such conduct would not be repeated in the future with respect to any issue; (c) a written response on open questions from B.L. regarding MLSD's use of third-party and outside groups; and (d) a review of the entire district by an outside auditor for the purpose of identifying material, content, and curricula that could be in violation of anti-discrimination and racial stereotyping laws, with a report of the findings of such auditor to be made public, and a commitment by MLSD to rectify such issues.

72.      B.L. never received a response.

73.      The conclusions of MLSD in the webinar included that students should be implored to act and become "anti-racist", and to attend Black Lives Matter rallies; "white children are receiving coded and sometimes direct messages all the time about their racial superiority"; "Explicit conversations that name race are needed if we want to interrupt racial biases white children are already forming"; and that middle and high school aged children need to be taught "about white peoples roles in perpetuating racism." The Matters Movement reinforced many of these same racially-motivated ideologies and provided a platform for a social justice political campaign which seeks open race-based political action.

74.     Such assertions constitute illegal indoctrination of racist tropes which are more suitable for a totalitarian "re-education camp" than for a New Jersey public school and caused damage to J.L. and other students in their being exposed to and educated in racially discriminatory rhetoric which violated their federal and state constitutional and statutory rights, some or all of which harm is irreparable.

75.     Despite ongoing protests and efforts to confirm that MLSD would discontinue such conduct, would openly acknowledge such conduct to the general public, and would train administrators and staff not to engage in such illegal conduct, defendants have failed and refused to so act and, thus, they continue to cause damage to J.L. and others as aforesaid.

### FIRST COUNT
### (Title VI: Injunction)

76.     The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

77.     J.L. and all similarly situated students were and are intended beneficiaries of federal funding of MLSD, including, but not limited to, in the application of such funding to curricula, direct and third-party programming, and staffing via contract or otherwise.

78.     Defendants treated similarly situated persons differently with respect to race, color, and support or opposition to political issues related to race and color in educational programming and curricula.

79.     MLSD receives federal funding for its educational programming and/or for those providing such indoctrination directly and/or through contractual arrangements, and its acts as aforesaid, including entry into one or more contracts which resulted in perpetuation of racial stereotypes, caused harm to all students of the district including, but not limited to, J.L., and to the district, state, and federal taxpayers.

80.     Defendants so acted, without limitation, by explicitly and/or implicitly adopting policies which were designed to discriminate against individuals because of their race and/or color, which policies are damaging to all students in that they promote racial stereotypes.

81.     Defendants so acted, without limitation, by explicitly discriminating against those who opposed the racially discriminatory policies of MLSD and the individual defendants, or some of them, by favoring those who supported and/or promoted such racially discriminatory policies and/or implementation of additional racially discriminatory policies.

82.     To the extent that defendants' conduct may have been motivated, in whole or in part, by benign or putatively positive motives, the racially discriminatory acts which occurred, and/or which were undertaken, promoted, and/or ignored, were not supported by a compelling government interest in remedying the effects of past discrimination and/or were not narrowly tailored so as to remedy such effects if they existed.

83.     At the time they engaged in such acts, MLSD and the individual defendants knew that there had not been any legal finding that MLSD had engaged in any racially discriminatory acts which had occurred, and for which remedial activity was required or necessary. Thus, such acts were gratuitous and motivated by a desire to discriminate against individuals and groups of individuals based on their "whiteness", and to hold them in disrepute, which simultaneously diminished "non-white" people by suggesting or affirmatively asserting that they were incapable of advancing to their highest and best selves because of the fraudulent notions of inherent white racism which were illegally being promoted, all of which caused damage to J.L. and others as aforesaid, and which created a hostile educational environment.

84.     By their acts and statements, defendants, or some of them who were decision-makers, expressed discriminatory motives for their conduct, and the sequence of events leading to

their conduct evidenced discriminatory intent which constituted a departure from normal policy and procedure.

     85.    For the reasons aforesaid, defendants have violated Title VI of the Civil Rights Act, which violations are ongoing, and are proximately causing damage to J.L. and others who are similarly situated.

     WHEREFORE, the plaintiffs demand Judgment on behalf of J.L. and all those similarly situated, and against MLSD and the individual defendants in their official capacities on behalf of MLSD, jointly and severally, as follows:

A. Restraining and enjoining MLSD, or anyone acting under it, from applying for or receiving federal funds for the school district until such time as it remedies its racially discriminatory practices;

B. Restraining and enjoining MLSD, or anyone acting under it, from funding, teaching, or otherwise supporting, overtly or covertly, any program that violates Title VI including, but not limited to, programs making claims about "white privilege", implied racism by individuals based on their race or color, and implied systemic injustice based upon skin color and race;

C. Appointing an independent third-party administrator who shall audit all MLSD curricula to ensure compliance with Title VI, and to ensure that administrators and staff within MLSD are annually trained on how not to violate Title VI by using racial and skin color classifications, and generalized concepts about the perceived racial superiority or inferiority of individuals based on race and color;

D. Restraining and enjoining MLSD, or anyone acting under it, from violating the Mountain Lakes School District Policies and Procedures including concerning race discrimination

including, but not limited to, Sections 2224, 6121, 6161.2, 2131.1, 6161.1, and 6144 thereof;

E.  Awarding nominal damages;

F.  Awarding the plaintiffs all legal fees and costs incurred in vindicating their rights and those of residents of Mountain Lakes with respect to Title VI violations;

G.  Awarding interest as allowed by law;

H.  Awarding such other and further relief as may be equitable and just.

## SECOND COUNT
### (42 U.S.C. § 1981: Hostile Educational Environment)

86.     The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

87.     By their acts, defendants, or some of them, caused injury to J.L. and those similarly situated because of defendants' specific and ongoing motivation to discriminate against and diminish people based on their race and/or skin color including, but not limited to, attributing racist characteristics to individuals, including B.L. and J.L., who are Caucasian and/or who have so-called white skin, and by diminishing others based on color and race, including the children of Objector 2, by attributing to them an inability to overcome the circumstances and characteristics of skin color and race at birth unless there is discrimination and/or "re-education" of so-called white peoples so as to cause advancement by diminishing so-called white peoples.

88.     But for such acts of discrimination by defendants, or some of them, no harm would have befallen J.L. and other similarly situated students of Mountain Lakes.

89.     The individual defendants acted in their official and personal capacities with the approval, implied or in fact, of MLSD.

90.     By reason of the acts of defendants as aforesaid, they created a hostile educational environment related to issues of race and skin color for J.L. and all other students in the Mountain Lakes School District, all of whom were damaged including, but not limited to, in their constitutional and statutory rights not to be discriminated against based on race and/or skin color, in violation of 42 U.S.C. § 1981.

WHEREFORE, the plaintiffs demand Judgment on behalf of J.L. and all those similarly situated, and against MLSD and the individual defendants individually and in their official capacities on behalf of MLSD, jointly and severally, as follows:

A.  Awarding compensatory damages;

B.  Awarding consequential damages;

C.  Awarding punitive damages;

D.  Awarding attorneys' fees and costs to the plaintiffs;

E.  Awarding interest as allowed by law.

F.  Awarding such other and further relief as may be equitable and just.

### THIRD COUNT
### (N.J.S.A. 10:5-1 *et seq.*: Law Against Discrimination)

91.     The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

92.     The plaintiff J.L. and others similarly situated suffered discrimination in his school, express or implied, based on his skin color and/or race as a result of the aforesaid acts and/or policies and/or violations of policy by the defendants, or some of them.

93.     Defendants, who were aware of their roles in the race and color based discrimination, knowingly encouraged and/or assisted in such discrimination, have at all times failed and refused to remedy such discrimination.

94.     Based on defendants' discriminatory conduct, the plaintiff and others similarly situated have been proximately caused to be damaged.

WHEREFORE, the plaintiffs demand Judgment on behalf of J.L. and all those similarly situated, and against MLSD and the individual defendants, jointly and severally, as follows:

   A.  Awarding compensatory damages;

   B.  Awarding consequential damages;

   C.  Awarding punitive damages;

   D.  Awarding attorneys' fees and costs to the plaintiffs;

   E.  Awarding interest as allowed by law.

   F.  Awarding such other and further relief as may be equitable and just.

## FOURTH COUNT
### (N.J.S.A. 10:6-2 *et seq.*: Civil Rights as to J.L. and those similarly situated)

95.     The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

96.     By their acts as aforesaid, defendants, or some of them, intentionally, recklessly, and/or negligently, interfered with and/or deprived J.L. and all those similarly situated of their civil rights as aforesaid, which are protected by the United States and/or New Jersey constitutions and/or laws including, without limitation, Art I cl. 5, Art I cl. 21, and Art. VII, Sec.1, cl. 1 of the New Jersey Constitution.

97.     Defendants proximately caused damage to J.L. and others similarly situated thereby.

WHEREFORE, the plaintiffs demand Judgment in their favor, and against MLSD and the individual defendants in their individual and official capacities on behalf of MLSD, jointly and severally, as follows:

A.      Awarding compensatory damages;

B.      Awarding consequential damages;

C.      Awarding punitive damages;

D.      Awarding attorneys' fees and costs to the plaintiffs;

E.      Awarding interest as allowed by law.

F.      Awarding such other and further relief as may be equitable and just.

## FIFTH COUNT
### (42 U.S.C. § 1983: First Amendment: B.L.)

98.     The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

99.     As set forth above, B.L. engaged in constitutionally protected conduct by petitioning the government for redress of grievances, in keeping with the First Amendment of the United States Constitution, as applied to defendants through the Fourteenth Amendment of the United States Constitution.

100.    MLSD maintained policies and procedures for the redress of parental grievances including, without limitation, MLSD Policy 9130, which was denied to B.L. because of the content of his speech and the nature of his grievances, which were not in sync with the desired curricula, educational programming, and objectives of defendants, or some of them, despite that such desired curricula, educational programming, and objectives were asserted to violate federal and state laws, regulations, and MLSD policies.

101.    Defendants' actions as aforesaid were not based on a compelling governmental interest and were not exercised as the least restrictive means with respect to B.L.'s grievances, and otherwise were wholly arbitrary, capricious, and irrational, and they otherwise served no legitimate government purpose.

102. Defendants were acting under color of law, and their knowing refusal to respond to B.L., or to respond to him in a meaningful manner, proximately caused the denial of B.L.'s First and Fourteenth Amendment protected rights as aforesaid, thus causing him damage.

WHEREFORE, B.L. demands Judgment in his favor, and against MLSD and the individual defendants in their individual and official capacities on behalf of MLSD, jointly and severally, as follows:

A.    Awarding nominal damages;

B.    Awarding punitive damages;

C.    Awarding attorneys' fees and costs to the plaintiffs;

D.    Awarding interest as allowed by law.

E.    Awarding such other and further relief as may be equitable and just.

## SIXTH COUNT
### (42 U.S.C. § 1983: Equal Protection B.L.)

103. The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

104. As set forth above, B.L. engaged in constitutionally protected conduct by petitioning the government for redress of grievances, in keeping with the Equal Protection Clause of the United States Constitution.

105. MLSD maintained policies and procedures for the redress of parental grievances including, without limitation, MLSD Policy 9130, which was denied to B.L. because of the content of his speech and the nature of his grievances, which did were not in sync with the desired curricula, educational programming, and objectives of defendants, or some of them, despite that such desired curricula, educational programming, and objectives were asserted to violate federal and state laws, regulations, and MLSD policies.

106. Likewise, defendant officials provided other, informal, channels of communication to parents and individuals interested in curriculum and programming issues, which were offered to those in agreement with defendant officials, but denied in all material respects to those who opposed or questioned defendant officials, as in the case of B.L.

107. Defendants' actions as aforesaid were wholly arbitrary, capricious, and irrational, and they otherwise served no legitimate government purpose, but rather, served defendants' desired interest in promoting illegal and racially discriminatory educational programming and curricula.

108. Defendants were acting under color of law, and their knowing refusal to respond to B.L., or to respond to him in a meaningful manner, proximately caused the denial of B.L.'s Equal Protection rights under the Fourteenth Amendment as aforesaid, thus causing him damage.

WHEREFORE, B.L. demands Judgment in his favor, and against MLSD and the individual defendants in their individual and official capacities on behalf of MLSD, jointly and severally, as follows:

A. Awarding nominal damages;

B. Awarding punitive damages;

C. Awarding attorneys' fees and costs to the plaintiffs;

D. Awarding interest as allowed by law.

E. Awarding such other and further relief as may be equitable and just.

## SEVENTH COUNT
### ((N.J.S.A. 10:6-2 *et seq.*: Civil Rights as to B.L.)

109. The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

110.    By their acts as aforesaid, defendants, or some of them, intentionally, recklessly, and/or negligently, interfered with and/or deprived the plaintiffs of their civil rights as aforesaid, which are protected by the United States and/or New Jersey constitutions and/or laws including, without limitation, Art. I cl. 1, Art. 1 cl. 6, Art. I cl. 21, and Art. VII, Sec.1, cl. 1 of the New Jersey Constitution, the First Amendment of the United States Constitution, the Fourteenth Amendment of the United States Constitution, and equal protection principles of the State of New Jersey which are broader than those contained in the United States Constitution.

111.    Defendants proximately cause B.L. damages thereby.

WHEREFORE, B.L. demands Judgment in his favor, and against MLSD and the individual defendants in their individual and official capacities on behalf of MLSD, jointly and severally, as follows:

A.    Awarding nominal damages;

B.    Awarding punitive damages;

C.    Awarding attorneys' fees and costs to the plaintiffs;

D.    Awarding interest as allowed by law.

E.    Awarding such other and further relief as may be equitable and just.

## EIGHTH COUNT
### (Declaratory Judgment)

112.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

113.    The parties to this action maintain a controversy with respect to school policies and procedures and related to alleged violations of state and federal laws which are ongoing and which continue to do harm.

114.    The plaintiffs are entitled to a declaration of the rights and responsibilities of the parties hereto arising out of such dispute, so as to settle claims and procedures which are to be effected hereafter.

WHEREFORE, the plaintiffs demand Judgment in their favor, and against MLSD and the individual defendants jointly and severally, as follows:

A. Declaring that defendants, or some of them, have and continue to violate Title VI of the Civil Rights Act.

B. Declaring that defendants have created and continue to create a hostile educational environment in violation of 42 U.S.C. § 1981 and/or N.J.S.A. 10:5-3 *et seq.*;

C. Declaring that defendants have violated the civil rights of the plaintiffs and continue to violate the civil rights of J.L. and all similarly situated individuals within the Mountain Lakes School District;

D. Restraining and enjoining MLSD, or anyone acting under it, from applying for or receiving federal funds for the school district until such time as it remedies its racially discriminatory practices;

E. Restraining and enjoining MLSD, or anyone acting under it, from funding, teaching, or otherwise supporting, overtly or covertly, any program that violates Title VI including, but not limited to, programs making claims about "white privilege", implied racism by individuals based on their race or color, and implied systemic injustice based upon skin color and/or race;

F. Restraining and enjoining MLSD, or anyone acting under it, from violating 42 U.S.C. § 1981;

G. Restraining and enjoining MLSD, or anyone acting under it, from violating N.J.S.A. 10:5-2 *et seq.*;

H. Restraining and enjoining MLSD, or anyone acting under it, from violating N.J.S.A. 10:6-3 *et seq.*;

I. Appointing an independent third-party administrator who shall audit all MLSD curricula and programming to ensure compliance with Title VI, and to ensure that administrators and staff within MLSD are annually trained on how not to violate Title VI by using racial and skin color classifications, and generalized concepts about the perceived racial superiority or inferiority of individuals based on race and color;

J. Restraining and enjoining MLSD, or anyone acting under it, from violating the Mountain Lakes School District Policies and Procedures including those concerning race discrimination and parental communications including, but not limited to, Sections 2224, 6121, 6161.2, 2131.1, 6161.1, 6144, and 9130 thereof;

K. Awarding the plaintiffs all legal fees and costs incurred in vindicating their rights and those of residents of Mountain Lakes with respect to Title VI violations;

L. Awarding interest as allowed by law;

M. Awarding such other and further relief as may be equitable and just.

## JURY DEMAND

Trial by jury of twelve persons is demanded on all Counts so triable.

MURRAY-NOLAN BERUTTI LLC

By: *Ronald A. Berutti*

Ronald A. Berutti
100 E. Hanover Avenue, Suite 401
Cedar Knolls, New Jersey 07927
Phone: (908) 588-2111
ron@murray-nolanberutti.com
Attorneys for Plaintiffs

Dated:  June 6, 2022

## **VERIFICATION**

B.L., of full age, verifies the following under penalty of perjury:

I am the plaintiff in the within matter. My initials are being used in order to protect my child, on whose behalf I am bringing this action, who was a minor at most times set forth herein. I have reviewed the Complaint and know the contents thereof, which I know to be true, except with respect to those acts which are not my own, which I believe to be true.

*B.L.*
_____
B.L.

Dated: June 6, 2022